WEEDEN LOVE

v.

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa March 28, 1896.*

1. WITNESSES—*accomplice is competent to testify.* The evidence of an accomplice is, in general, admissible against a prisoner on trial.

2. SAME—*joint defendant in indictment may testify after nolle is entered.* One jointly indicted with others may be called as a witness for the State after the entry of a *nolle prosequi* as to him.

3. SAME—*wife of joint defendant may testify after nolle is entered.* The wife of a defendant in an indictment may be called as a witness against his co-defendants, where a *nolle prosequi* has been entered as to her husband.

4. TRIAL—*general verdict for burglary and larceny—effect.* A general verdict of guilty, not fixing the value of the property, under an indictment charging burglary and larceny in the same count, is a conviction of burglary, as a verdict convicting for larceny must find the value of the property stolen.

5. BURGLARY—*entrapping defendant into commission of.* Burglary is not committed by those assisting a detective in entering a building and taking money from a safe in pursuance of a previously arranged plan between him and the owner, with the sole intent of entrapping the others into the apparent commission of a crime.

6. CRIMINAL LAW—*effect of arranging to have crime committed against one's property.* Acts, otherwise criminal, done by a party against property at the instigation and by the encouragement of a detective, who acts in pursuance of a plan previously arranged with the owner of the property, do not constitute a crime.*

7. SAME—*an owner cannot aid in crime against his own property.* The owner of property and his agent may wait passively for a would-be criminal to perpetrate a complete offense against such property for himself, but must not aid, encourage or solicit him that they may seek to punish.

WRIT OF ERROR to the Circuit Court of Kankakee county; the Hon. CHARLES H. STARR, Judge, presiding.

W. R. HUNTER, for plaintiff in error.

---

*The authorities as to the effect of instigatio    r consent to crime for the purpose of detecting the criminal, as a    efense to prosecution, are reviewed in a note to *Connor* v. *People*, (·    ol.) 25 L. R. A. 348.

M. T. MOLONEY, Attorney General, (T. J. SCOFIELD, M. L. NEWELL and SAMUEL RICHOLSON, of counsel,) and H. L. RICHARDSON, State's Attorney, for the People.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

Plaintiff in error was convicted of burglary under an indictment charging Mulligan O'Brien, Weeden Love, William Shoof, Al Robinson and Aaron Perkins with burglariously breaking and entering the office building of Arthur L. Hoag on the 20th day of January, 1895. On the morning of the day on which the trial of this plaintiff in error was commenced, the State's attorney *nol pros'd* as to the defendant William Shoof. On motion of Aaron Perkins he was granted a separate trial and the cause was continued as to him. Plaintiff in error and O'Brien were tried and the latter found not guilty. The punishment of Love was fixed at imprisonment in the penitentiary for the term of one year. Robinson was not arrested.

William Shoof was called as witness for the State, and his competency as a witness was denied by the defendant. The evidence of an accomplice is, in general, admissible against a prisoner on trial. (*Gray* v. *People*, 26 Ill. 344; *Earll* v. *People*, 73 id. 329; *Friedberg* v. *People*, 102 id. 160.) The State's attorney had a right to *nolle* the indictment as to one of the persons indicted and call him as a witness for the State. He is a competent witness, and his credibility is to be determined by the jury. The error assigned on this question cannot be sustained, and for the same reason the error assigned for permitting the wife of William Shoof to testify is not well taken.

The indictment contained three counts, in each of which the offense of burglary is charged, and in each count the indictment then proceeds to charge the defendants with then and there being in said office building, and "did steal, take and carry away," etc. Such an in-

dictment charges both burglary and larceny, and these offenses may be found in the same count. (1 Hale's Pleas of the Crown, 556; 1 Russell on Crimes, 827; 2 Archbold's Crim. Pl. & Pr. 329-331.) Where a defendant is found guilty generally, and a punishment imposed which is by law authorized to be inflicted for either offense charged in such a count, the verdict must be sustained. (*Crowley* v. *Commonwealth*, 11 Metc. 575; *Cook* v. *State*, 4 Zabr. 846; *Manly* v. *State*, 7 Ind. 148; *Froleck* v. *State*, 11 id. 213; *State* v. *Hooker*, 17 Vt. 658.) The effect of this general verdict is, logically, the jury found the defendant guilty of burglary. They did not find the value of the property stolen, which would not have been necessary in a conviction for burglary but which was necessary in a conviction for larceny. The verdict finding the defendant, Love, guilty generally, and fixing his punishment, was, therefore, a conviction for burglary, and not obnoxious to the error assigned that it failed to specify the offense for which he was convicted. (*Lyons* v. *People*, 68 Ill. 271.) Had the conviction been for larceny it would then have been necessary to find the value of the property stolen, and had the court been asked to instruct the jury that they were warranted in finding the defendant guilty of larceny if the evidence authorized it, it would doubtless have done so. *Ruth* v. *People*, 99 Ill. 185.

Without undertaking a consideration of the instructions to which exceptions are taken, we will enter into a discussion of the facts of this case, which we deem the question of paramount importance and on which the decision must depend. In the latter part of 1894 and early part of 1895 much complaint had been made in the city of Momence of existing lawlessness. Robberies and burglaries had occurred until complaints reached the members of the city council, whereupon a consultation of certain members was held, which resulted in the employment of a detective agency in the city of Chicago, from which a detective was sent to investigate, report, and

seek to arrest the offenders. Within two weeks prior to the commission of this act, that detective, who went by the name of Robinson, visited the city of Momence. He seemed to be well supplied with money, which he used lavishly and ignobly. The uncontradicted evidence shows he made the acquaintance of this plaintiff in error, who was impecunious, and with bad habits as to the use of intoxicating liquors and haunting saloons and billiard rooms. Through this acquaintance with Love, he, at his own request, was introduced to O'Brien, Perkins and Shoof by Love. These were all young men without much money, and similar in their habits to this plaintiff in error, frequenting the same resorts. After becoming thus acquainted, this detective, by the liberal and extravagant use of money in treating to whisky, beer and cigars, caused these young men to follow after him, seek his association, answer his requests and comply with his wishes. Plausible, self-contained and strong, he was calculated to work on their weaker natures. Well-dressed and affable, he pleased them, and an apparent liberality with money,—even giving one or two dollars at a time to these young men on different occasions,—made him an object of admiration, and he easily led and influenced them. He endeavored to excite a desire for crime by intimating his means were thus acquired. He suggested and proposed they should engage in the commission of burglaries, robberies, etc., and sought to induce them to engage with him in such acts. Day after day and night after night his efforts were not directed to the arrest of criminals, but his mental powers and robust health, with the use of money, were directed towards an effort to make criminals of these young men. With plenty to drink and smoke and eat at his expense, he sought to undermine and dazzle their mental and moral strength and lead them into the commission of crime. Ambitious, doubtless, to succeed in his chosen pursuit, with him the conviction of those theretofore guilty was less an object

than that he might fasten on some one the commission of a crime. If he could make the criminal and induce the commission of the crime and cause the arrest of the actor, or throw around him a web of circumstances that would lead to conviction, it would redound to the glory of his chief and cause his advancement. With him the end justified the means, and the reputation of the agency to which he belonged and his own advancement were apparently his object. Such means and agents are more dangerous to the welfare of society than are the crimes they were intended to detect and the criminals they were to arrest. Robinson, having for several days been in close association with Love, proposed he should accompany him to Exline, and whilst there he called on Hoag, whose office was subsequently alleged to have been burglarized. From the testimony it is apparent that Hoag knew his office was to be entered and safe opened, and he acted in concert with the detective, and complied with his request in leaving money in the safe with the expectation of the office being burglarized and safe opened, etc. He not only expected it to be done, but he made the safe ready. He marked his money for the purpose of having it taken by a burglarious entry. In brief, he left money in the safe to be stolen, with knowledge from the detective that he, the detective, had "some fellows he was trying to catch, and he might probably want to come there to catch them. * * * I expected the money to be stolen, and for that reason marked it. * * * I locked the safe. * * * I thought the detective would open it in some way. * * * I left the money believing the office was to be burglarized. * * * He, the detective, asked me to leave the money there and I told him I would." One cannot read the evidence of this witness without being impressed with the fact that he prepared his safe and office to be burglarized and his money taken, and was willing and consented to its being done. With such an arrangement perfected between the occupant of the

building which was to be burglarized and this detective, the latter, under pretense of taking a train from Kankakee on a certain night, requested the plaintiff in error to take him to the latter city, and it is apparent he induced him to have Shoof, O'Brien and Perkins accompany them, that they might have a good time. With this object in view two buggies were procured. The hire was paid by the detective, and he and Love in one, with Perkins, O'Brien and Shoof in the other, started from Momence for Kankakee, and with each buggy there was a half-pint of whisky furnished by Robinson. Arriving at Kankakee the five men went to a saloon, where Robinson further evidenced his hospitable character, and there from fifteen to twenty drinks to each man were taken between about four o'clock and six o'clock,—whisky, beer, etc. About the latter hour the detective took the whole party to a restaurant, where he had supper furnished for which he paid. They then again returned to the saloon, from which Robinson sent one man for sacks, another for candles and another for oil, he in each case furnishing the money. Shoof and Love went from the saloon voluntarily, and Shoof obtained some money which was owing him, and he then purchased a revolver and some cartridges, and at the request of Love purchased a revolver for him, which the latter loaded. This, with reference to these transactions, is the first act shown to have been done by this defendant which was not influenced by the detective. When the party was again at the saloon more drinks were had, which were paid for by Robinson, and about ten o'clock the party repaired to a house of ill-fame, where three bottles of beer were paid for by Shoof. Who suggested the visit to this place is not shown by the evidence. Remaining there about an hour they again repaired to the same saloon. In all this time, whilst at this saloon, Robinson frequently, in private conversations with some of these parties separately, suggested and urged the commission of burglaries and

robberies. When the latter proposition was proposed to O'Brien he refused to have anything to do with it. Robinson now, at a late hour, provided two pint bottles of whisky, and with one to each buggy, left Kankakee for Exline, where they left their buggies, went direct to Hoag's office, the door of which was unlocked by Robinson with one of a bunch of keys taken from his pocket, and the parties entered. O'Brien was so drunk he fell over a chair or other object whilst in the room. Robinson went direct to the safe, and within five minutes made the combination, unlocked and opened the safe, took therefrom the money which Hoag left there to be taken, and handed the same to this plaintiff in error. That money was subsequently divided by Robinson, and each of these parties had a part thereof. The safe was again locked, the office vacated and door shut, and Robinson suggested they would need some tools for further operations, and led the way to a blacksmith shop, where he forced open a window, took therefrom some sledges, etc., and handed them to O'Brien. These were carried to their vehicles and the party returned to Momence, where the horses and vehicles were returned to the livery stables, and about four o'clock in the morning,—as soon as they could do so after returning their vehicles to the stables, —the entire party met at Momence in front of the bank. The uncontradicted testimony is that this meeting was with the expectation that they were to go to the train to see Robinson off. After meeting all the party in front of the bank, Robinson stepped to the door of the bank and violently shook it, creating a noise, whereupon from the opposite side of the street the single policeman of the city rushed, whilst from the rear of the bank came the chief of the detective agency with one of his employees and a third party, and firing their pistols rushed towards these indicted parties, some of whom ran. Love was seized and the others soon arrested. The marked money taken from Hoag's safe was found on the arrested

parties, the tools from the blacksmith shop found, etc. The presence of the chief of the detective agency and one of his employees, with a third party, at the rear of the bank, and the location of the single policeman of the city opposite the bank at this opportune time, may have resulted from the fact that Robinson sent from Kankakee on that afternoon a telegram, but to whom is not shown.

These are the material facts in evidence. The indictment for burglarizing Hoag's office, under which this defendant was convicted, rests on this evidence. One does not escape the conviction that Robinson entered that office with Hoag's consent. If Robinson entered the building with Hoag's consent and took the money with no intent of stealing it, but in pursuance of a previously arranged plan between him and Hoag, intending solely to entrap the defendant into the apparent commission of a crime, it is clear that no burglary was committed, there being no felonious intent on the part of Robinson in entering the building or taking the money. If no burglary was committed by Robinson because of an absence of a felonious intent, the defendant could not have been an accomplice and privy to a burglary. *Speiden* v. *State,* 3 Tex. App. 156; *People* v. *Collins,* 53 Cal. 185; *Allen* v. *State,* 40 Ala. 334; *Eggenton's case,* 2 East's Cr. L. 666; *Regina* v. *Johnson,* 1 Car. & M. 218; *McDaniel's case,* Foster, 121; *Ream's case,* 2 East's Cr. L. 734; *Kemp* v. *State,* 11 Humph. 320; *Lyons* v. *People, supra.*

Strong men are sometimes unprepared to cope with temptation and resist encouragement to evil when financially embarrassed and impoverished. A contemplated crime may never be developed into a consummated act. To stimulate unlawful intentions for the purpose and with the motive of bringing them to maturity so the consequent crime may be punished, is a dangerous practice. It is safer law and sounder morals to hold, where one arranges to have a crime committed against his property or himself, and knows that an attempt is to be made to

encourage others to commit the act by one acting in concert with such owner, that no crime is thus committed. The owner and his agent may wait passively for the would-be criminal to perpetrate the offense, and each and every part of it, for himself, but they must not aid, encourage or solicit him that they may seek to punish.

After a careful consideration of the evidence in this record, and with a deliberative regard for the importance of the question under discussion, we are constrained to hold the evidence does not sustain this conviction. The judgment is reversed and the defendant is ordered discharged.                              *Judgment reversed.*