STATE OF NORTH CAROLINA v. JERRY FRANCISCO BOOHER

No. 42A81

(Filed 4 May 1982)

**Rape and Allied Offenses § 5— first degree sexual offense—insufficiency of evidence—encouraging and inducing defendant to commit crime**

    The evidence of a first degree sexual offense was insufficient to be submitted to the jury where the facts indicated the prosecuting witness actively encouraged and ultimately induced defendant to commit the crime. The evidence tended to show that defendant, a Marine Corps corporal, before the incident for which he was tried had attempted to persuade the prosecuting witness, a Marine Corps sergeant, to engage in consensual homosexual acts and the prosecuting witness had refused. The witness decided to arrange a tape-recorded encounter with defendant to document the facts that he was not a homosexual and was not, voluntarily at least, engaging in homosexual acts

with defendant. The prosecuting witness first invited defendant into his apartment, and a lengthy conversation ensued while both men were sitting on the prosecuting witness's loveseat, during which defendant made sexual overtures. The prosecuting witness's knife, which had been under the loveseat, was introduced into the conversation by the witness, who said to the defendant, "Are you going to kill me with that knife?" Later the prosecuting witness apparently *handed the knife* to the defendant or *sat it down next to him*, and defendant then took it from the coffee table and used it to force the prosecuting witness to engage in fellatio.

Justice MITCHELL took no part in the consideration or decision of this case.

BEFORE *Judge Robert D. Rouse, Jr.*, presiding at the 22 September 1980 Session of ONSLOW Superior Court defendant was tried on an indictment charging him with a first degree sexual offense.[1] He was convicted of first degree sexual offense and sentenced to life imprisonment. He appeals.

*Rufus L. Edmisten, Attorney General, by William W. Melvin, Deputy Attorney General, and William B. Ray, Assistant Attorney General, for the State.*

*Adam Stein, Appellate Defender, by Malcolm R. Hunter, Jr., Assistant Appellate Defender, for defendant appellant.*

EXUM, Justice.

The question dispositive of this appeal is whether the evidence was sufficient to be submitted to the jury on the question of defendant's guilt of a first degree sexual offense. We conclude that it was not.

The state's evidence consisted almost entirely of the testimony of Timothy Moore. According to Moore, he first met defendant on 30 May 1980 at a "Welcome Aboard" meeting upon Moore's arrival at Camp Lejeune. At the time of trial Moore was a twenty-one-year-old sergeant in the Marine Corps with three years and two months' service in the Corps. During the Welcome

---

1. According to the record, the state offered defendant a plea bargain arrangement whereby in return for a plea of guilty to the offense of crime against nature, for which he was separately indicted, defendant would receive a three-to-five year sentence and the state would dismiss the charge of first degree sexual offense. Defendant declined the offer, and the state proceeded to trial only on the first degree sexual offense indictment.

Aboard meeting, defendant invited Moore out that evening to drink beer and shoot pool. Moore agreed, and the two spent the evening together. They both returned to defendant's home where defendant grabbed Moore and bit him on the neck. Upset, Moore left defendant's home on foot. Shortly thereafter, defendant approached Moore in defendant's vehicle and gave Moore a ride to Moore's vehicle. During the ride Moore expressed concern about the bite on his neck and wondered out loud what he would tell his wife. When Moore arrived home he explained to his wife what had happened with defendant.

On 1 July 1980, Moore saw Booher again on base and Booher apologized for what had happened earlier. On 16 July 1980, two days after Moore's wife had given birth to a child and was still hospitalized, defendant called Moore and invited him out. Upon defendant's assurance that "there would be no funny business," Moore agreed to go. They rode around, drank beer, smoked marijuana, got together with other friends of defendant and finally arrived at defendant's home. Defendant asked Moore to remove his clothes, and Moore refused. Defendant told Moore that if he didn't disrobe, defendant would report Moore to military officials as being a homosexual. Moore left, arriving at his home at approximately 1 a.m.

After Moore arrived home, defendant drove up. Moore turned on his tape recorder. Defendant came to the door and Moore invited him inside "for two reasons. Number one, I wanted documentation that I was not having an affair with him, and two, I just, you know, wanted to talk with him and maybe try to straighten things out a little bit. When he came in the tape recorder was playing."

A transcription of the tape-recorded conversation that ensued between Moore and defendant was offered into evidence. According to the transcription, much of what defendant said in response to Moore's statements was inaudible. In essence, the transcription shows that Moore invited defendant into his home by saying, "Let's rap man, let's talk. Hey, come here. I wanna see what I can do for ya, man. . . . I'd like to talk with ya, I'd like to talk with ya." Defendant replied, "You want to hurt me." Moore assured defendant that he did not want to hurt him but only wanted to talk. The two talked at length. The conversation dealt

State v. Booher

with: defendant's concern that Moore was going to hurt him and Moore's protestations to the contrary; the prior encounters of the two men; homosexual relationships in general; defendant's expressions of affection for and attempts at physical contact with Moore and Moore's verbal protestations; the relationship between love and hate; and the introduction of a knife belonging to Moore. According to Moore, the conversation took place while the men "were sitting on . . . a small couch, called a loveseat." During it, defendant "was trying to slide his hands and arms . . . above my waist and on my shoulders."

The transcript shows that the first discussion regarding the knife proceeded as follows:

B I need you.

M But you can't have me.

B So?

M *If you need me, kill me.*

B (Inaudible)

M *Jerry Booher, are you gonna kill me with that knife?*

B Are you gonna give me what I want?

M Huh?

B Are you gonna give me what I want?

M No.

B Yes you are.

M I can't give you what you want, whether you're holding that knife or not.

B Yes you will.

M I can't and I won't.

B Yes you will.

M I can't and I won't.

B Yes you will.

M No I won't.

B You will.

---

**State v. Booher**

---

M  I won't.

B  Yes you will.

M  I can't and I won't. No, I can't give it to you.

B  (Inaudible)

M  I'm glad, man.

B  (Inaudible)

M  I'm glad you don't want it, what I'm saying is man —

·  B  (Inaudible)

(Emphasis supplied.)

The knife, described by Moore as a twenty-first birthday present, later entered into the transcribed portions of the conversation as follows:

M  Do you wanna die?

B  Yes.

M  No, you don't.

B  You don't know how much.

M  You want to die?

B  You bet.

M  If you want to die, man, this here was my 21st birthday present.

B  Will you [obscenity omitted] do it or you don't.

M  I'm not gonna do it, man. I'm not gonna kill nobody.

B  Put it back. You're just [obscenity omitted], then, put it back.

M  I like you, man.

B  Well, put it back.

M  But I don't love you.

B  So?

M  Can you understand?

State v. Booher

B You love me or you'd kill me right now.

M No.

B And don't give me no [obscenity omitted].

M No.

B Yes, you do.

M You just can't go killing people.

B Yes, you love me.

M I can't kill—

B You love me.

M I don't love you.

B Yes, you do.

M No, I don't. I can't.

B Yes, you do.

M Okay, if I didn't love you, I'd kill you, right?

B That's right.

M No, that's [obscenity omitted).

Shortly thereafter the tape transcript ended and Moore's trial testimony continued. Moore said that when defendant entered the apartment the knife was underneath the loveseat where he and defendant were sitting and talking. Eventually the knife appeared "either on the big coffee table . . . in front of the loveseat or . . . directly underneath it." Moore said, "I either handed this knife to Mr. Booher or sat it down right next to him. I did that to show him that he didn't really mean what he said about wanting to die. . . . The knife that was used was my knife."

Moore then testified that defendant "reached over, picked up the knife off the coffee table and put it in my side and told me to drop my drawers. At this time we were still seated on the loveseat." Defendant then held the knife against Moore's arm. Moore said, "I really didn't think we was going to do it and he said that he would stick me with the knife, cut me, and so we stood up and he stood up right next to me and at that time, I

reached with my free hand and unsnapped my trousers. I let them fall about my knees and . . . took my underwear down and he pushed me back on the couch. The knife always remained right there. Well, it moved a little bit, but it always remained in my side. The pressure from the knife remained about the same. I was very afraid. After that he lowered his head to my penis and performed oral sex." Moore said this lasted for a couple of minutes, that he "did not have an orgasm or anything" and that defendant "raised his head and dropped the knife right there on the floor." Moore got up, dressed himself, and told the defendant to "get the hell out." Defendant refused to leave. Moore continued to insist that defendant leave; defendant remained adamant in his refusal to do so. Moore finally called the police.

According to officers who responded to the call, both Moore and defendant were engaged in a bitter verbal dispute when they arrived at Moore's home. The officers had difficulty ascertaining what had happened. Both parties were taken to the magistrate's office by a Jacksonville police officer, Walter Lamb. Lamb, despite the magistrate's request, wouldn't sign an arrest warrant. Instead, Lamb called his supervisor who agreed to assign a detective to the case.

Jacksonville detective William Whitehead arrived at the magistrate's office at approximately 3:45 a.m. on July 17 and talked with the magistrate, Moore and the defendant. Whitehead sent Lamb and Moore to pick up Moore's tape recorder. After listening to the tape, Whitehead placed defendant under arrest and later signed an arrest warrant charging defendant with a first degree sexual offense under G.S. 14-27.4.

Defendant, testifying on his own behalf, denied committing the crime charged against him. According to defendant Moore invited him to his home on the evening in question to celebrate the birth of Moore's baby. When defendant arrived Moore was nude, but later put on his underwear. Defendant said he never threatened Moore or forced him "to have sexual relations with me. . . . I couldn't do that kind of thing. He told me he wanted to be friends. I wanted to be friends and he wants to be friends." Defendant, a Marine Corps corporal with approximately eight years of service, testified, "[B]ut if I talk to him about something I don't want it to be going into nothing and he thinks his rank is

going to back him up. It's like a tug of war. I talk to him, he talks to me. He says he wants to be friends, you know. He said he wants me to talk to him. I wanted to talk to him too. I went to a psychiatrist on base. I tried to get out."

Because of the bizarre and unique facts of this case, we are satisfied the evidence is insufficient to support the verdict. Both a first and second degree sexual offense, insofar as they may be committed against an adult not physically or mentally handicapped, have as an essential element the lack of the victim's consent because they must be committed "by force and against the will" of the victim. G.S. 14-27.4(a)(2); G.S. 14-27.5(a)(1); *State v. Locklear*, 304 N.C. 534, 284 S.E. 2d 500 (1981); *State v. Jones*, 304 N.C. 323, 283 S.E. 2d 483 (1981). In *Locklear*, we said the phrase "by force and against the will," as used in both the new rape statutes, G.S. 14-27.2 and 14-27.3, and the new sexual offense statutes, "means the same as it did at common law when it was used to describe some of the elements of rape." 304 N.C. at 539, 284 S.E. 2d at 503. The words "against her will" as used in the law of rape connote the victim's lack of consent. *State v. Barefoot*, 241 N.C. 650, 86 S.E. 2d 424 (1955).

No criminal offense which requires the victim's lack of consent may be committed upon a person who "arranges for a crime to be committed against himself, and aids, encourages or solicits the commission of it." *State v. Nelson*, 232 N.C. 602, 604, 61 S.E. 2d 626, 628 (1950). A more complete statement of the principle was given in *State v. Burnette*, 242 N.C. 164, 170-71, 87 S.E. 2d 191, 195-96 (1955), as follows:

> In certain crimes consent to the criminal act by the person injured eliminates an essential element of the offense, and is, therefore, a good defense. Where a person arranges for a crime to be committed against himself or his property and aids, encourages or solicits the commission thereof, such facts are a good defense to the accused. However, if a person knows a crime is contemplated against his person or property, he may wait passively and permit matters to go on, or create the conditions under which the crime against himself may be committed, for the purpose of apprehending the criminal without being held to have assented to the act. [Citations omitted.]

In *People v. Hartford L. Ins. Co.*, [252 Ill. 398, 96 N.E. 1049 (1911)], the Illinois Supreme Court said: 'One cannot arrange for a crime to be committed against himself or his property, and aid, encourage, or solicit the commission of the crime (*Love v. People*, 160 Ill. 501, 32 L.R.A. 139, 43 N.E. 710 [1896]), but if he does not induce or advise the commission of the crime, and merely creates the condition under which an offense against the public may be committed, the rule does not apply (*People v. Smith*, 251 Ill. 185, 95 N.E. 1041 [1911]).'

Both *Nelson* and *Burnette* were sexual assault cases.

The principle was applied in *State v. Goffney*, 157 N.C. 624, 73 S.E. 162 (1911), in which the state's evidence showed that defendant was apprehended as he broke and entered a store owned by a Mr. Barnes. The state's evidence also showed that Barnes had instructed one of his employees to induce defendant, a former employee, to commit the offense. The Court held that a directed verdict of not guilty should have been entered, stating, *id.* at 626, 73 S.E. at 163:

In the case at bar the owner himself gave permission for the defendant to enter, which destroyed the criminal feature and made the entry a lawful one.

Upon the facts in evidence no crime was committed, because the entry was with the consent and at the instance of the owner of the property.

The principle was most recently applied in *State v. Boone*, 297 N.C. 652, 256 S.E. 2d 683 (1979), another felonious entry case.

The principle applies only to criminal acts where want of consent of the victim is an essential element. It is not the same as, and should not be confused with, the doctrine of entrapment. *See State v. Jackson*, 243 N.C. 216, 90 S.E. 2d 507 (1955); *State v. Burnette, supra.* Entrapment, as a defense to criminal conduct, applies to crimes whether or not want of consent is an element of the offense and arises out of actions of law enforcement authorities or their agents. *State v. Walker*, 295 N.C. 510, 246 S.E. 2d 748 (1978); *State v. Burnette, supra.*

When considered as a whole, Moore's testimony is to this effect: Defendant, a Marine Corps corporal, before the incident for

State v. Booher

which he was tried, had attempted to persuade Moore, a Marine Corps sergeant, to engage in consensual homosexual acts. Moore refused. Moore, concerned that defendant might bring accusations that he was homosexual to military authorities, decided to arrange a tape-recorded encounter with defendant to document the fact that Moore was not a homosexual and was not, voluntarily at least, engaging in homosexual acts with defendant. It was thus important to Moore to demonstrate not only that defendant was the aggressor, but that Moore was an unwilling participant. To do this Moore first invited defendant into his apartment, saying among other things, "I want to see what I can do for ya, man." A lengthy conversation ensued while both men were sitting on Moore's loveseat, and during which defendant made sexual overtures. Moore's knife, which had been under the loveseat, was introduced into the conversation by Moore, who said, "Jerry Booher are you going to kill me with that knife?" Later, Moore again called defendant's attention to the knife in connection with their discussion about whether defendant wanted to die and whether Moore would kill him. At this point apparently Moore *handed the knife* to defendant or *sat it down next to him.* Defendant then, according to Moore, later took it from the coffee table and used *it to* force Moore to engage in fellatio.

The only reasonable conclusion to be drawn from this evidence is that Moore arranged for, aided, encouraged, and actually induced defendant to use the knife against him. We do not intend to suggest that Moore desired to have a sexual encounter with defendant under circumstances designed to give the appearance that he was forced. We accept as true Moore's statement that he did not desire such encounters. The principle governing the case remains the same. For, by all the state's evidence, Moore induced defendant to force Moore to engage in a homosexual act, not because Moore desired to participate in the act, but because he desired to document the fact that he was an unwilling participant. In essence, then, Moore consented to defendant's acts of force, which, in law, robs defendant's actions of those elements necessary for a conviction of a first or second degree sexual offense. In light of all the evidence we can give no weight to Moore's puny protestation, "I was very afraid."

This is not a case where the victim of a crime, knowing one is contemplated against his person or property, waits passively and

permits the crime to occur in order to apprehend the criminal. It is clear from the evidence that Moore had no intention of having defendant arrested for his acts. He sought only to document certain facts relative to their relationship. Moore determined to call the police only after defendant adamantly continued to remain on Moore's premises after Moore had asked him to leave. Further, Moore did not passively permit the crime against him to be committed. He actively encouraged and ultimately induced defendant to commit the crime.

We recognize that the precise point here decided was not argued on appeal. Defendant did move at trial for dismissal of all charges at the close of the state's evidence and again at the close of all the evidence because of evidentiary insufficiency. Both motions were denied. Defendant on appeal argues that the evidence was insufficient to convict him of a first degree sexual offense on the ground that there was insufficient evidence of the use of a deadly weapon. Nevertheless, when this Court firmly concludes, as it has here, that the evidence is insufficient to sustain a criminal conviction, even on a legal theory different from that argued, it will not hesitate to reverse the conviction, *sua sponte*, in order to "prevent manifest injustice to a party." N.C. R. App. P. 2. *See, e.g., State v. Samuels*, 298 N.C. 783, 787, 260 S.E. 2d 427, 430 (1979) (sufficiency of evidence reviewed but no reversal); *State v. Cox*, 281 N.C. 131, 187 S.E. 2d 785 (1972).

Defendant's conviction of a first degree sexual offense is, therefore,

Reversed.

Justice MITCHELL took no part in the consideration or decision of this case.