WILSON v. BELLAMY

[105 N.C. App. 446 (1992)]

MICHELLE MARIE WILSON, BY AND THROUGH HER GUARDIAN AD LITEM, RONALD C. WILSON, PLAINTIFF-APPELLANT v. DEAN BELLAMY, DOUG MUMMA, DONNIE BAUCOM, CHRIS BARCO, STEVE GHOULIS, EDDIE MEDFORD, JEFF GORDON, LAMBDA CHI ALPHA FRATERNITY, ZETA CHAPTER, AN UNINCORPORATED ASSOCIATION; LAMBDA CHI ALPHA FRATERNITY IN-CORPORATED, LCA-ALUMNI PROPERTIES, A NORTH CAROLINA LIMITED PARTNERSHIP, DEFENDANTS-APPELLEES

No. 9130SC245

(Filed 3 March 1992)

1. **Appeal and Error § 322 (NCI4th)— no certification of delivery of transcript or service of proposed record—no way to determine timeliness**

   The Court of Appeals exercised its discretion to hear an appeal even though appellant did not include a copy of the court reporter's certification of delivery of transcript or a copy of the certification of service of the proposed record on appeal, so that the court was unable to determine whether the proposed record or record on appeal was timely filed. N.C.R. App. P. 2.

   **Am Jur 2d, Appeal and Error §§ 292, 495.**

2. **Appeal and Error § 418 (NCI4th)— assignments of error—not set out in brief—no supporting authority—abandoned**

   Assignments of error which were not set out in the plaintiff's brief and for which no support was offered were abandoned. N.C.R. App. P. 28(b)(5).

   **Am Jur 2d, Appeal and Error §§ 649, 650.**

3. **Evidence and Witnesses § 694 (NCI4th)— exclusion of evidence—no offer of proof—assignment of error overruled**

   An assignment of error to the exclusion of evidence was overruled where the record did not disclose what the witnesses' testimony would have been had they been permitted to testify. N.C.G.S. § 8C-1, Rule 103.

   **Am Jur 2d, Appeal and Error § 604.**

4. **Evidence and Witnesses § 2891 (NCI4th)— sexual battery—action for damages—victim's prior sexual history and prior drinking incident—not admissible**

   In an action for damages arising from an alleged gang rape at a fraternity party, reversed on other grounds, the

trial court should not have allowed the defense on cross examination to elicit testimony from plaintiff concerning her prior sexual experiences and a prior incident of passing out after drinking at a fraternity party. Although N.C.G.S. § 8C-1, Rule 412 has been applied to date only in criminal cases, the logic is of similar import in the civil arena and nothing elicited by the defense here through these questions would tend to indicate that the plaintiff gave her consent to the acts allegedly performed by the individual defendants. Furthermore, this court has specifically held that testimony as to the victim's alcohol consumption with other people in party settings has no tendency to prove that the victim consented to sexual activity with the defendant on the day in question.

**Am Jur 2d, Evidence § 336; Rape §§ 119, 120.**

5. **Evidence and Witnesses § 1942 (NCI4th)— sexual assault at fraternity party—letter regarding alcohol abuse at fraternity— not relevant to time or circumstance**

A letter written to a fraternity president by an Assistant Vice Chancellor reciting various alcohol abuses and placing the fraternity on probationary status was not relevant to time or circumstance in an action for damages arising from an alleged gang rape at the fraternity where the incident at issue in this case occurred almost a full eleven months after the incidents in the letter and well after the probationary status was to have terminated, and, while the incidents alleged in the letter include providing alcohol to non-drinking age individuals, they include several other activities not included in this case. Furthermore, even if the letter was deemed to be relevant, the probative value would be substantially outweighed by the danger of unfair prejudice.

**Am Jur 2d, Evidence § 298.**

6. **Evidence and Witnesses § 154 (NCI4th)— telephone conversation—identification of voice—not properly authenticated**

The trial court did not err by concluding that a witness had failed to properly authenticate a voice he had heard in a telephone call as that of one of the defendants where the witness failed to show that he had an opinion as to the identity of the caller based upon hearing the voice at any other time

under circumstances connecting it with the speaker. N.C.G.S. § 8C-1, Rule 901(b)(5).

**Am Jur 2d, Evidence §§ 381, 383.**

**Sufficiency of identification of participants as prerequisite to admissibility of telephone conversation in evidence. 79 ALR3d 79.**

7. **Assault and Battery § 2 (NCI4th)— criminal battery—civil action—directed verdict**

The trial court did not err in granting a directed verdict for several of the individual defendants in a civil action arising from an alleged gang rape even though plaintiff argued that defendants violated N.C.G.S. § 14-33(a) and (b). The same act may constitute both a crime and a tort, but no civil right can be predicated upon a mere violation of a criminal statute.

**Am Jur 2d, Assault and Battery § 119.**

8. **Assault and Battery § 2 (NCI4th)— civil assault—unconscious victim—directed verdict for defendants**

The trial court did not err by granting a directed verdict for defendants on a claim for civil assault arising from an alleged gang rape at a fraternity party where plaintiff admitted that she had no recollection of the happening of the things of which she had accused defendants. That testimony was an admission that plaintiff had no apprehension of harmful or offensive contact, which is the gist of an action for civil assault.

**Am Jur 2d, Assault and Battery §§ 110, 111, 119, 213.**

9. **Assault and Battery § 2 (NCI4th)— gang rape—civil battery—sufficiency of evidence**

The trial court correctly granted a directed verdict for some of the individual defendants on a claim for civil battery arising from an alleged gang rape at a fraternity where plaintiff failed to present any evidence that those defendants ever made any physical contact with her, and incorrectly granted directed verdict for other defendants who testified that plaintiff initiated their touching and that the touching was consensual, while plaintiff claimed that she was unconscious and that any contact was nonconsensual. The determination of whether

plaintiff consented to the contacts rests solely on the credibility of the witnesses and is properly presented to the jury.

**Am Jur 2d, Assault and Battery § 213; Rape § 119.**

10. **Trespass § 2 (NCI3d)— sexual battery—intentional infliction of emotional distress—not extreme and outrageous conduct**

The trial court did not err by granting a directed verdict for defendants on a claim for intentional infliction of emotional distress arising from an alleged gang rape at a fraternity where the evidence showed that one of the defendants knew that plaintiff had been drinking and couldn't make a judgment as to what she wanted to do and that defendant and one other engaged in kissing and heavy petting with the plaintiff in the presence of others. The record only presents some evidence of a sexual battery, and the Court of Appeals was not willing to hold, on this record, that a sexual battery standing alone constitutes the required extreme and outrageous conduct.

**Am Jur 2d, Negligence §§ 281, 308.**

**Modern status of intentional infliction of mental distress as independent tort: "outrage." 38 ALR4th 998.**

11. **Negligence § 35.1 (NCI3d)— sexual battery—negligence of fraternity—contributory negligence of plaintiff**

The trial court did not err by granting a directed verdict for a fraternity on negligence claims arising from a sexual battery at a fraternity party where, assuming that plaintiff stated valid negligence claims, plaintiff was contributorily negligent as a matter of law where plaintiff admitted that she voluntarily consumed half a bottle of champagne, at least five or six beers, and a shot of Southern Comfort liquor. Plaintiff failed to present sufficient evidence to support a claim for willful or wanton negligence in that, at best, plaintiff only showed that defendants may have been inattentive or inadvertent to the fact that alcohol was being served to minors.

**Am Jur 2d, Assault and Battery § 153; Negligence §§ 859-861, 942, 943.**

APPEAL by plaintiff from judgment entered 23 August 1990 by *Judge J. Marlene Hyatt*, JACKSON County Superior Court. Heard in the Court of Appeals 4 December 1991.

On 5 May 1988 Michelle Wilson (plaintiff) filed this action against the defendants. She alleged that the individual defendants Chris Barco (Mr. Barco), Donnie Baucom (Mr. Baucom), Dean Bellamy (Mr. Bellamy), Steve Ghoulis (Mr. Ghoulis) and Doug Mumma (Mr. Mumma) committed an assault and battery, sexual assault and battery, and gang rape upon her, and that each intentionally inflicted emotional distress upon her. The plaintiff also alleged that individual defendants Jeff Gordon (Mr. Gordon) and Eddie Medford (Mr. Medford) intentionally inflicted emotional distress upon her. The plaintiff further alleged that the Zeta Chapter of Lambda Chi Alpha Fraternity and Lambda Chi Alpha Fraternity, Inc. were negligent in that they served alcohol to minors; failed to properly govern the Zeta Chapter and those attending a fraternity party on the evening of the 8th and into the morning of the 9th of October 1987; and that the fraternity violated Chapter 18B of the North Carolina General Statutes and the common law. Finally, plaintiff alleged that LCA Alumni Properties negligently failed to prevent the Zeta Chapter from serving alcohol to minors. At the close of the plaintiff's evidence a motion for directed verdict was granted on behalf of each defendant. Plaintiff appeals.

The evidence, taken in the light most favorable to the plaintiff, shows the following: The plaintiff, a seventeen year old freshman at Western Carolina University, participated in a sorority "rush" and pledged Alpha Xi Delta Sorority. During the pledge process the plaintiff learned that her "big sister" from the sorority was Leslie Holshouser (Ms. Holshouser). Ms. Holshouser gave the plaintiff "a bottle of champagne as a gift of celebration." The plaintiff and other sorority members then "went over to the Lambda Chi House for a party or celebration." Prior to arrival at the Lambda Chi House, the plaintiff had not consumed any alcoholic beverages that day.

Upon arrival at the Lambda Chi House, plaintiff and her sorority sisters went inside. A short while later, plaintiff and Ms. Holshouser went outside to open the bottle of champagne. The two then returned inside, drank the champagne, and began socializing with their sorority sisters and the fraternity members. The plaintiff then engaged in two beer "chugging contests" during which

she drank "two beers really fast." After the contests the plaintiff socialized some more, danced, and consumed "about three or four" more beers. Fraternity members served the beer, which was provided by both the sorority and the fraternity. The plaintiff was never asked to present an I.D. card indicating her age. The plaintiff then noticed people going up and down the fraternity house stairs. She went upstairs where she "had a shot of Southern Comfort" liquor, returned downstairs, socialized, drank more beer, and began dancing with Phillip Brooks (Mr. Brooks). The plaintiff and Mr. Brooks danced for approximately fifteen or twenty minutes, and the two went outside to talk where it was cooler. After a short conversation, Mr. Brooks told the plaintiff that he was engaged and asked if she would mind going upstairs with him so that "people wouldn't bother him about him talking to another girl when he had a girlfriend." The plaintiff agreed.

After climbing the stairs, the plaintiff had only vague recollections of what transpired. She testified: "I remember the room was really dark. It was like totally black. I remember I was just lying there or leaning back or something and just shaking my head and saying, 'No, no.' It was just—I couldn't see anything, I just remember just, 'No, no.' " The plaintiff then remembers "coming to again and seeing like just a picture of guys standing in the doorway, just like I came to and saw them and then like I went right back out." The plaintiff also remembers waking up while lying on a couch. She did not have a shirt on, her bra was either fastened or hanging on her, and her panties were missing. Mr. Barco "came over" and she asked him to take her home. At that time the plaintiff "was extremely intoxicated. . . ." Mr. Barco gave her a shirt to wear and asked Mr. Bellamy to take her home. Before the plaintiff left, however, Mr. Barco found her shirt, returned it to her and retrieved his own shirt.

When the plaintiff arrived back at her dorm she was still intoxicated and felt "[v]ery confused, scared, totally helpless. [She] just felt terrible[,]" and she went to bed. When the plaintiff awoke, she was still feeling the effects of alcohol. Her "whole body ached . . . . like when you have the flu . . . ." The plaintiff got up, dressed and left to go to class. She met Ms. Holshouser in the hallway and the two conversed. Afterwards, the plaintiff "felt worse. [She] was scared, confused, [and] felt dirty." She remained in her room for most of the rest of the day.

WILSON v. BELLAMY

[105 N.C. App. 446 (1992)]

Mr. Mark Buchanan, then a criminal investigator with the Jackson County Sheriff's Department, testified over objection that the plaintiff told him that Ms. Holshouser told her that Mr. Ghoulis had told Ms. Holshouser, "that he and some of his friends at the fraternity had done something at the party that he had not done in a long time. She said that he told her that he and a friend of his named Donnie Baucom and some other boys had gang banged a sorority sister of [hers] that was wearing a pink skirt. . . . [B]oth knew that [the plaintiff] was the girl." The plaintiff also told her boyfriend that "something terrible had happened to her. . . . She wasn't sure what it was, but she was pretty sure she had been raped and she didn't know to what degree." However, the plaintiff admitted that she has no personal recollection of any sexual intercourse or other battery which she has accused the defendants of committing upon her.

Phillip Price (Mr. Price), the plaintiff's boyfriend, testified that after talking to the plaintiff he confronted Mr. Barco. He asked Mr. Barco "if he heard [the plaintiff] speaking or talking or making any sort of noise. And [Mr. Barco] said all he heard was a few moans and groans and there were no words spoken." Mr. Price also testified that when he talked to Mr. Baucom, the following colloquy took place.

"Look, man, I don't know what happened. You know, I'm confused about the whole thing. I don't know what happened." [Mr. Price] said, "Well, what do you know that happened?" And [Mr. Baucom] said he went up [sic] the room where [the plaintiff] was and he walked in the room and there was no one else there but there was a girl lying in [sic] the couch, covered in a blanket. He could not see her face. And he said her panties were lying on the floor. He picked up the panties and went out into the chapter room and swung them around and showed them to his brothers. And then they followed him back into the room. And then he told me that he pulled his pants down a little bit and then he told the other, he said, "Wouldn't it be great if she was awake and (then we could do it.") And then he pulled his pants back up and he said he went back downstairs to get some more beer and was down there for quite awhile. Came back upstairs and the next thing he saw was [the plaintiff] coming from the rest room and coming back through the chapter room.

## WILSON v. BELLAMY

[105 N.C. App. 446 (1992)]

The plaintiff did not visit a doctor the day after the party to determine whether there was semen or sperm in her vaginal area. However, she did visit a doctor about a week later and found out that she was not pregnant and that she did not have any sexual disease. The plaintiff also sought counseling. Dr. Kevin Roberts, a psychiatrist, diagnosed the plaintiff as having post-traumatic stress disorder, which in his opinion was caused by events that transpired at the fraternity house.

Mr. Ghoulis testified that he was a member of Lambda Chi Alpha and that he lived in the Lambda Chi Alpha fraternity house. He arrived at the party around 10:30 p.m. and drank approximately four beers between 10:30 p.m. and 2:00 a.m. At 2:00 or 2:30 a.m. Mr. Ghoulis decided to go upstairs to his room. He walked upstairs and went into Mr. Bellamy's and Mr. Barco's room, because he was told that the plaintiff was there. Mr. Ghoulis did not know the plaintiff personally but had seen her earlier that night and knew who she was. Mr. Ghoulis sat down on the couch beside the plaintiff and began talking with her. The plaintiff was coherent, sitting up and wearing a pink dress and a sweatshirt. Mr. Baucom, Mr. Mumma, Mr. Barco and Mr. Bellamy were also in the room. Mr. Ghoulis asked the plaintiff "if she wanted to go downstairs and have — continue with the partying, or if she wanted to go home, or what she wanted to do." She said that she did not want to do either one and began kissing Mr. Ghoulis. The other men continued talking. The kissing became more intense, and "[the plaintiff] proceeded to take her underwear off. [Mr. Ghoulis] gave [a] little assistance, but not much." The two became "more involved." The plaintiff grabbed Mr. Ghoulis's penis, unbuttoned Mr. Ghoulis's pants, and helped Mr. Ghoulis partially disrobe. The two lay down side by side on a couch facing each other. While "her skirt was up and [his] pants were loosened down they moved their hips together." Mr. Ghoulis did not penetrate the plaintiff's vagina. However, the heavy petting continued until Mr. Ghoulis ejaculated. Mr. Ghoulis did not know where his spermatozoa went and did not attempt to clean any up. The plaintiff's clothing was later determined to have spermatozoa on it. After he ejaculated Mr. Ghoulis left the room.

Mr. Barco testified that he arrived at the party at approximately 10:00 p.m., and drank about five beers before he left at 2:00 or 3:00 a.m. While there, he saw minors drinking alcoholic beverages. After Mr. Barco left the party, he went upstairs to his room. Mr. Ghoulis, Mr. Baucom, Mr. Mumma, Mr. Bellamy and the

plaintiff were already there. The plaintiff was clothed and sitting on a sofa. Mr. Barco "sat around and talked for awhile. . . . and [then] noticed [Mr. Ghoulis and the plaintiff] kissing." Mr. Ghoulis and the plaintiff began "touching each other pretty heavily." Mr. Barco and the others "just sat there and watched them and then they . . . got beside each other on the couch." "They began . . . to pull each other's clothes off, started touching each other and everything." Mr. Ghoulis touched the plaintiff "[o]n the breasts and on her butt and stuff like that." The petting progressed. The plaintiff's shirt and skirt came up, her panties came off and Mr. Ghoulis' pants came down. Both Mr. Ghoulis and the plaintiff took off her panties. The two "were lying beside each other and just moving against each other." "All the sudden [Mr. Ghoulis] sat up and excused himself and he walked out." Mr. Barco then left. When he left the plaintiff was sitting up on the couch, had her skirt on and her shirt was pulled up. Mr. Barco later saw the plaintiff in the hallway. She was wearing one of his shirts and she asked him where the bathroom was located. Mr. Barco told the plaintiff where that bathroom was and that he would try to find her shirt. Mr. Barco found her shirt in his room, returned it to her and retrieved his own shirt. The plaintiff then asked Mr. Barco for a ride home. He declined because he had been drinking but got Mr. Bellamy to drive her home. Mr. Barco did not kiss or touch the plaintiff and did not see Mr. Baucom kiss or touch the plaintiff. He also did not see anyone ejaculate on her sweatshirt.

Mr. Mumma testified that he attended the party and drank fewer than four beers. After being at the party for about thirty minutes, Mr. Mumma went upstairs to the "Chapter room." Mr. Baucom noticed someone in Mr. Bellamy's and Mr. Barco's room. Mr. Mumma followed Mr. Barco, Mr. Bellamy and Mr. Ghoulis into the room. The plaintiff was fully clothed and seated on the sofa. Mr. Ghoulis sat next to the plaintiff. The plaintiff began "making advances towards [Mr. Ghoulis] and it was kind of mutual." "[The plaintiff] took her panties off." Mr. Mumma did not remember whether the plaintiff's shirt was pulled up. Mr. Mumma continued talking with his friends and "making fun of" Mr. Ghoulis. Mr. Ghoulis then got up and left the room. Mr. Mumma and the others went out into the hall. The plaintiff also left, went to the bathroom and then returned to the same room. Mr. Mumma and the others returned to the room after the plaintiff. Mr. Baucom sat next to the plaintiff on the sofa. The plaintiff "was wearing a T-shirt or

something." The plaintiff began "making moves towards [Mr. Baucom]." "They were kissing and hugging and touching each other." The plaintiff then got up and went to the restroom again. Mr. Mumma returned to his room and went to sleep. Mr. Mumma did not touch the plaintiff and did not see anyone ejaculate on her sweatshirt or skirt.

Mr. Bellamy testified that he attended the party but did not drink because he was the designated driver. During the evening, Mr. Baucom told Mr. Bellamy that someone was in his and Mr. Barco's room. Mr. Bellamy and some other men then went into the room. When he walked in the plaintiff and Mr. Ghoulis were talking to each other. They started kissing and the plaintiff began "putting the moves" on Mr. Ghoulis. The plaintiff pulled Mr. Ghoulis' pants down and started "playing with him." Mr. Ghoulis "succumbed." The plaintiff then got up, went to the bathroom, came out, "stopped and looked at [the men,] . . . smiled and then strutted her way back into [Mr. Bellamy's] room." Mr. Mumma, Mr. Baucom and Mr. Bellamy followed her. Once inside, Mr. Baucom began talking to the plaintiff, and the two began kissing. The plaintiff then got up and went to the bathroom again. Mr. Bellamy later drove her home. Mr. Bellamy did not see anyone ejaculate on the plaintiff's shoulder.

According to Mr. Baucom's answers to the plaintiff's interrogatories, Mr. Baucom first saw the plaintiff when he walked by a fraternity house room. Because there had been a number of thefts from fraternity rooms, Mr. Baucom was "worried about her being in . . . [the room] by herself." Mr. Baucom told the people that lived in the room that someone was in their room. Five people then went in the room and one sat beside the plaintiff. Mr. Baucom and some others went to another room. The plaintiff then came out and asked where the bathroom was located. "[W]hen she came out of the bathroom she returned to the room where she had been [before]. The people that lived in the room then told [Mr. Baucom] that they wanted the plaintiff to leave so that they could go to bed. Mr. Baucom volunteered to ask the plaintiff to leave. When [Mr. Baucom] went in the room, [he] sat down beside [the plaintiff] and was trying to ask her to leave. At some point [the plaintiff] started kissing on [his] neck and holding [him]. She was persistent at kissing [him] so a couple of times [he] responded to her kisses. She then pulled up her sweater and lifted up her arms. [Mr. Baucom] understood that she wanted [him] to help

her take off her sweater so [he] did. She made no disapproval at any time . . . ." The plaintiff then got up and went to the bathroom again. When she returned she was ready to leave. Mr. Baucom gave her her sweater and one of the other men took her home.

Mr. James Medlin (Mr. Medlin) testified that he is both a limited partner in LCA Properties, which owned and leased the fraternity house to the Zeta Chapter of Lambda Chi Alpha at Western Carolina University, and an officer of the corporate general partner of LCA Alumni Properties, Lambda Chi Alpha Housing Corporation. Mr. Medlin was also the Lambda Chi Alpha fraternity advisor, the High Pi, at the time of the alleged incident. Because Mr. Medlin was the High Pi, he is a member of the High Zeta, the governing body of the local fraternity chapter. It is the duty of the High Zeta to enforce the laws and policies of the national fraternity including a national fraternity resolution that all local fraternal activities involving alcoholic beverages comply with institutional policies and state and local law.

Mr. Medlin testified that he knew that the local drinking age was twenty-one at the time of the alleged incident. However, he could not say whether he had seen anyone under the legal drinking age drink alcohol at a Lambda Chi Alpha party because he did not know how old everyone was. Mr. Medlin also testified that he did not make it a practice to check every fraternity party to insure that the fraternity complied with state and local liquor laws. However, if he was at a party he would conduct spot checks to see that the fraternity was in compliance. Mr. Medlin also testified that he did "step[ ] on a soapbox and explain[ ] to [the fraternity members] that they must be responsible and be alert and attune to the laws of the State and the Federal Government, . . . and the National Fraternity." Mr. Medlin did not know whether other partners of LCA Alumni Properties took any action to check consumption of alcohol. Mr. Barco testified that minors, including himself, drank in front of Mr. Medlin at Lambda Chi Alpha parties.

At the conclusion of the plaintiff's evidence, each defendant moved for a directed verdict. Plaintiff appeals from directed verdicts entered in favor of the defendants.

**WILSON v. BELLAMY**

[105 N.C. App. 446 (1992)]

*Patrick U. Smathers, P.A., by Patrick U. Smathers, for plaintiff-appellant.*

*Morris, Bell & Morris, by William C. Morris, Jr. and William C. Morris, III, for defendant-appellees.*

EAGLES, Judge.

## I

[1] We note initially that the appellant did not include a copy of the court reporter's certification of delivery of transcript or a copy of the appellant's certification of service of the proposed record on appeal to the appellee in the record on appeal. (The record does include a certificate of service dated 7 March 1991 which is incorrectly designated as being for the proposed record on appeal. This certification could not have been for the proposed record on appeal as the appellee served its objections to the appellant's proposed record on appeal on 21 February 1991.) Thus, we are unable to determine from the record before us whether the proposed record on appeal or the record on appeal was timely filed. However, in our discretion, we choose to address this appeal on its merits. N.C.R. App. Pro. 2.

## II

[2] Plaintiff raises seventeen assignments of error. Rule 28(b)(5) of the North Carolina Rules of Appellate Procedure provides that: "Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned." Here, the plaintiff's brief fails to both set out and offer support for assignments of error numbers 5, 6, 7, 8, 9, 10, 11 and 15. Accordingly, each has been abandoned.

## III

[3] In her first, second, third and fourth assignments of error the plaintiff alleges that the trial court erred by sustaining objections of the defendant to plaintiff's questions of Mr. Ghoulis and Mr. Barco concerning alcohol use and instructions from defendant's national fraternity advisor regarding alcohol use. " 'It is well established that an exception to the exclusion of evidence cannot be sustained where the record fails to show what the witness' testimony would have been had he been permitted to testify.' " *River Hills Country Club, Inc. v. Queen City Automatic Sprinkler*

*Corp.*, 95 N.C. App. 442, 446, 382 S.E.2d 849, 851 (1989) (citing *State v. Simpson*, 314 N.C. 359, 370, 334 S.E.2d 53, 60 (1985) and N.C. Gen. Stat. Sec. 8C-1, R. Evid. 103 (1988) ). Because the record before us does not disclose what the witnesses' testimony would have been had they been permitted to testify, this assignment is overruled.

## IV

[4] In her twelfth and fourteenth assignments of error, plaintiff argues that the trial court erred by allowing the defense to elicit testimony from the plaintiff concerning her prior sexual experiences. Our disposition does not require that we reach the merits of this assignment. However, because this issue is likely to arise on remand we choose to address it here. *Lowder v. All Star Mills, Inc.*, 82 N.C. App. 470, 478, 346 S.E.2d 695, 700 (1986).

During defense counsel's cross-examination of the plaintiff the following exchange took place:

Q. How long have you been having sexual relations prior to the 8th day of October, 1988 — 7?

MR. SMATHERS: Objection.

THE COURT: Overruled.

MR. SMATHERS: Your Honor, he didn't ask for a specific answer. He said, "How long prior to."

THE COURT: Overruled.

A. About two and a half years.

Q. Pardon?

A. Two and a half years.

Q. You started when you were fourteen, I believe?

A. Right.

Upon further cross-examination the following exchange occurred:

Q. LINE 21. "Before the date of October 8, 1987, had you ever before passed out because of drinking?" Did I ask you that question?

MR. SMATHERS: Objection. Relevancy.

WILSON v. BELLAMY

[105 N.C. App. 446 (1992)]

THE COURT: Overruled.

A. Yes.

Q. And did you not answer and say, "Once before"?

A. Yes.

Q. And didn't I ask you, "When was that?" And you said, "The night that I went to the Delta Sig party after I got home." Wasn't that your question and answer you gave?

A. Yes.

Q. And then I asked you, "That happened after you got back to your dormitory?" And your answer was, "Yeah, like I came home and my boyfriend had called me on the phone and I had answered the phone. But like after he called me I guess I passed out because when he got there"—

MR. SMATHERS: Objection.

Q. —"he said that he"—

MR. SMATHERS: Relevance.

THE COURT: Overruled.

Q. —"he said that he undressed me and like put me in bed but I don't remember him moving me around or anything." Isn't that correct?

A. Yes.

Plaintiff argues that the questions in each colloquy are irrelevant and therefore inadmissible. The defense, however, argues that "[t]he purpose of evoking these responses from the plaintiff was to demonstrate to the jury that the probabilities were that the plaintiff consented to alleged but unproved sexual overtures rather than rejecting them." We agree with the plaintiff.

Generally, all relevant evidence is admissible and all non-relevant evidence is not admissible. N.C.R. Evid. 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.R. Evid. 401.

In *State v. Younger*, 306 N.C. 692, 295 S.E.2d 453 (1982), our Supreme Court noted that at one time evidence of a prosecuting witness's general reputation for unchastity was admissible during a rape trial to attack her credibility and show her proneness to consent to sexual acts. *Id.* at 695, 295 S.E.2d at 455. However, the court continued and pointed out that "[t]oday, 'common sense and sociological surveys make clear that prior sexual experiences by a woman with one man does not render her more likely to consent to intercourse with an often armed and frequently strange attacker.' " *Id.* at 695-96, 295 S.E.2d at 455 (quoting *State v. Fortney*, 301 N.C. 31, 38, 269 S.E.2d 110, 114 (1980)). We note that this holding was reached only after the enactment of G.S. 8-58.6, the former rape victim shield statute, now codified in N.C.R. Evid. 412. G.S. 8-58.6 (cross-reference). We also note that our research reveals that, to date, Rule 412 has only been applied in criminal cases. However, the logic applied behind the law espoused in *Younger* under the auspices of G.S. 8-58.6, is of similar import in the civil arena. Nothing elicited by the defense through the objected to questions above would tend to indicate that the plaintiff gave her consent to the acts allegedly performed by the individual defendants. Furthermore, this court has specifically held that "testimony as to the victim's alcohol consumption with other people in party settings has no tendency to prove that the victim consented to sexual activity with the defendant on the day in question." *State v. Cronan*, 100 N.C. App. 641, 644, 397 S.E.2d 762, 764 (1990), *disc. review dismissed*, 328 N.C. 573, 403 S.E.2d 516 (1991). Neither the plaintiff's testimony as to the length of time she has engaged in sexual conduct nor the incident occurring after the Delta Sig party is relevant here.

V

[5] In her thirteenth assignment of error the plaintiff argues that the trial court erred by excluding from evidence the testimony of Mr. Douglas Davis (Mr. Davis), an Assistant Vice Chancellor for Student Development at Western Carolina University, as well as a letter that Mr. Davis wrote to Mr. Matt Barden (Mr. Barden), then president of the local chapter of Lambda Chi Alpha fraternity. Plaintiff argues that this evidence is "relevant in both time and circumstances" because it indicates "a pattern of alcohol abuse and knowledge of such abuse by the fraternity and its officers. . . ." We disagree and hold that the evidence is not relevant as to time or circumstance.

Generally, all relevant evidence is admissible and all non-relevant evidence is not admissible. N.C.R. Evid. 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.R. Evid. 401. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." N.C.R. Evid. 403.

The substance of Mr. Davis' *voir dire* testimony was devoted to laying a foundation for introduction of the letter which he wrote Mr. Barden on 11 November 1986. Thus, disposition of this assignment turns upon whether the letter itself was properly admissible into evidence. The letter, in pertinent part, reads as follows:

This letter is to confirm our conversation of November 11, 1986 concerning recent incidents by the Lambda Chi Alpha Fraternity, i.e., providing alcohol to non-drinking age individuals (this was discussed with the fraternity by the adviser); charging admission and providing alcoholic beverages which constitutes illegal sales; alcohol being sold by the drink; posting public invitations and holding open type parties.

After reciting the above incidents, Mr. Davis imposed various restrictions on the fraternity including, but not limited to, placing the fraternity on probationary status through the school's 1987 spring break.

This letter is neither relevant to time or circumstance. The incidents cited in Mr. Davis's letter warranting imposition of restrictions on the fraternity must have occurred before the 11 November 1986 date of the letter. The incident at issue in this case occurred on 8 October 1987 almost a full eleven months after the incidents in Mr. Davis' letter and well after the probationary status was to have terminated. Also, the letter is addressed to the then president, Mr. Matt Barden. However, Mr. Barden's name does not appear on the Lambda Chi Alpha membership roster (plaintiff's exhibit 8) purporting to cover the time of the alleged incident. The letter does not indicate whether a copy was sent to the other fraternity officers who are listed on the membership roster.

Moreover, the incidents recited in the letter leading to the imposition of restrictions are not relevant to the circumstances of the instant case. The incidents alleged in the letter do include

"providing alcohol to non-drinking age individuals." However, they also include several other activities not involved in the instant case: charging admission to parties where alcohol is sold; selling alcohol by the drink; posting public invitations; and holding open parties. Furthermore, even if the letter was deemed to be relevant, the probative value of the letter's contents would be substantially outweighed by the danger of unfair prejudice. In short, the letter would unfairly tend to lead jurors to believe that because the fraternity had done things wrong in the past, the fraternity must have done something wrong here. We agree with the trial court and overrule this assignment of error.

## VI

[6] By her sixteenth assignment of error plaintiff argues that the trial court committed reversible error by concluding that Mr. Price failed to properly authenticate a voice he heard in a telephone call as that of Mr. Gordon, and then striking Mr. Price's testimony. We disagree.

"G.S. § 8C-1, Rule 901(b)(5) provides for the authentication or identification of a voice where there is '[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.'" *State v. Mullen*, 98 N.C. App. 472, 477, 391 S.E.2d 520, 523 (1990). Here, during direct examination Mr. Price testified:

Q. Do you know Jeff Gordon?

A. I've known of him. I've met him.

Q. And prior to October 8, 1987, had you occasion to talk with Jeff Gordon?

A. Yes, I had.

Q. For what purpose?

A. I was in a band and we were inquiring if we could of the fraternity—asking if we could play at a party.

Q. Okay. Had you occasion to talk to him on the telephone before?

A. Before what?

Q. October 8th of '87?

A. No, I don't think so.

Q. At the time that you talked to him, did you talk with him face to face?

A. Yes.

Q. And approximately how many times have you done that?

A. Maybe twice.

However, on cross-examination, Mr. Price testified:

Q. And you said that the voice on the other end of this telephone call that you got said, "Hello, I'm Jeff Gordon."

A. I don't know if that is what he said.

Q. Is that the substance of what he said?

A. Yes, he identified himself.

Q. He identified himself as Jeff Gordon?

A. Yes.

Q. Other than that how do you know it was Jeff Gordon?

A. Other than that?

Q. Yes.

A. No.

Q. You have no other way except for what he said to know that was Jeff Gordon?

A. Correct.

Here, Mr. Price initially indicated that he recognized Mr. Gordon's voice because of earlier conversations between Mr. Gordon and himself. However, he recanted that testimony when he stated that the only way he knew that the voice he heard was that of Mr. Gordon was identification the voice gave on the telephone. Mr. Price failed to show that he had an opinion as to the identity of the caller based upon hearing the voice at any time under circumstances connecting it with the speaker other than the phone call. "[W]hen there is no other evidence to authenticate the identity of the speaker who placed the call except that he states his name, the evidence is inadmissible as hearsay." *Santora, McKay & Ranieri*

*v. Franklin*, 79 N.C. App. 585, 587, 339 S.E.2d 799, 801 (1986) (citation omitted). Accordingly, this assignment is overruled.

## VII

In her seventeenth assignment of error the plaintiff argues that the trial court erred in granting a directed verdict in favor of each defendant on each of the plaintiff's claims for relief.

"On a motion by a defendant for a directed verdict at [the] close of [the] plaintiff's evidence in a jury case, as here, the evidence must be taken as true and considered in the light most favorable to [the] plaintiff." *Farmer v. Chaney*, 292 N.C. 451, 452-53, 233 S.E.2d 582, 584 (1977). All evidentiary conflicts must be resolved in favor of the non-movant. *Daughtry v. Turnage*, 295 N.C. 543, 544, 246 S.E.2d 788, 789 (1978). Credibility of testimony is for the jury, not the court, and a genuine question of fact must be tried by a jury unless that right is waived. *Price v. Conley*, 21 N.C. App. 326, 328-29, 204 S.E.2d 178, 180 (1974). "[T]he motion should be denied if there is any evidence more than a scintilla to support plaintiff's prima facie case in all its constituent elements." *Wallace v. Evans*, 60 N.C. App. 145, 146, 298 S.E.2d 193, 194 (1982) (citations omitted). However, if a plaintiff fails to present evidence of each element of her claim for relief she will not survive a directed verdict motion. *Felts v. Liberty Emergency Serv.*, 97 N.C. App. 381, 383, 388 S.E.2d 619, 620 (1990).

### Criminal Battery

[7] The plaintiff argues that the individual defendants Mr. Barco, Mr. Baucom, Mr. Bellamy, Mr. Ghoulis and Mr. Mumma violated G.S. 14-33(a) and 14-33(b) and, therefore, the trial court erred in granting the individual defendants a directed verdict. We disagree.

"The same wrongful act may constitute both a crime and a tort." 21 Am. Jur. 2d *Criminal Law* § 2 (1981). However, "no civil right can be predicated upon a mere violation of a criminal statute, . . .; the crime is an offense against the public pursued by the sovereign, [and] the tort is a private injury which is pursued by the injured party." 74 Am. Jur. 2d *Torts* § 1 (1974). *See, e.g., State v. Hines*, 36 N.C. App. 33, 42, 243 S.E.2d 782, 787, *disc. review denied and appeal dismissed*, 295 N.C. 262, 245 S.E.2d 779 (1978) ("The ultimate loss [or damage] to the victim . . . is an issue which is irrelevant to the purpose of the criminal statute

and is an issue properly within the province of the civil courts.").
This argument is without merit.

## Civil Assault

[8] Plaintiff also argues that the individual defendants Mr. Barco,
Mr. Baucom, Mr. Bellamy, Mr. Ghoulis and Mr. Mumma committed
a civil assault upon her. The plaintiff's brief states "[t]he under-
signed will not insult this [C]ourt with an analysis of the law on
assault and battery. . . ." This case, by its very essence, is an
assault and battery case. "The elements of assault are intent, offer
of injury, reasonable apprehension, apparent ability, and imminent
threat of injury." *Hawkins v. Hawkins*, 101 N.C. App. 529, 533,
400 S.E.2d 472, 475, *disc. review allowed*, 329 N.C. 496, 407 S.E.2d
533 (1991) (citation omitted). "The gist of an action for assault is
apprehension of harmful or offensive contact." *Morrow v. Kings
Department Stores, Inc.*, 57 N.C. App. 13, 19, 290 S.E.2d 732, 736,
*disc. review denied*, 306 N.C. 385, 294 S.E.2d 210 (1982). Here,
during cross-examination the plaintiff testified as follows:

> Q. Not that you remember. Now, while we're on the sub-
> ject of that, you have no recollection of the happening of any
> of the things that you've accused the members of Al—of Lamb-
> da Chi Alpha do you?
>
> A. No.

This testimony is an admission by the plaintiff that she did not
have any apprehension of harmful or offensive contact. This assign-
ment is overruled.

## Civil Battery

[9] The plaintiff also alleges that the individual defendants Mr.
Barco, Mr. Baucom, Mr. Bellamy, Mr. Ghoulis and Mr. Mumma
committed a civil battery upon her. "The elements of battery are
intent, harmful or offensive contact, causation, and lack of privilege."
*Hawkins*, 101 N.C. App. at 533, 400 S.E.2d at 475. "The gist of
an action for battery is 'the absence of consent to . . . contact
on the part of the plaintiff.'" *Morrow*, 57 N.C. App. at 19, 290
S.E.2d at 736 (citation omitted). However, a person who is un-
conscious or insensibly drunk cannot give consent to physical con-
tact. *See, e.g., State v. Moorman*, 320 N.C. 387, 392, 358 S.E.2d
502, 505 (1987); and *State v. Aiken*, 73 N.C. App. 487, 499, 326

S.E.2d 919, 926, *disc. review denied and appeal dismissed*, 313 N.C. 604, 332 S.E.2d 180 (1985).

Here, the plaintiff failed to present any evidence that the individual defendants Mr. Barco, Mr. Bellamy, or Mr. Mumma ever made any physical contact with her. The plaintiff has no personal recollection of being touched by any of the men. The men did not admit touching her, and no one testified that any of them touched her. Accordingly, this assignment is overruled.

The plaintiff did, however, present testimony that both Mr. Ghoulis and Mr. Baucom touched her and participated in sexually motivated physical conduct with her. Indeed, during their testimony both men admitted touching the plaintiff. Both men also testified that the plaintiff initiated the touching and that the touching was consensual. The plaintiff, on the other hand, claimed that she was unconscious and that any contact was non-consensual. She testified:

> Q. And what's the next thing you remember after getting up to the top of the stairs?

> A. I remember that the room was really dark. It was like totally black. I remember I was just lying there or leaning back or something and just shaking my head and saying, "No, no." It was just—I couldn't see anything, I just remember just, "No, no."

> Q. Okay. After saying that, what's the next thing you remember?

> A. I remember coming to again and seeing like just a picture of guys standing in the doorway, just like I came to and saw them and then like I went right back out.

> Q. When you say, "came to," what do you mean by that?

> A. I was unconscious. I was—I didn't know what was going on. It was just like all the sudden a spot that I can remember, just like I woke up and then went right back to sleep.

Here, the plaintiff presented evidence of each element of civil battery, including conflicting testimony as to whether the plaintiff was conscious and able to give her consent to the admitted contacts by Mr. Ghoulis and Mr. Baucom. The crux of the matter, then, is the determination of whether the plaintiff consented to the contacts. That determination rests solely on the credibility of the

witnesses, and is an issue properly presented to the jury, not the court. *See Price*, 21 N.C. App. at 329, 204 S.E.2d at 180. Accordingly, it was error for the trial court to direct a verdict in favor of the individual defendants Mr. Ghoulis and Mr. Baucom on the civil battery claim, and we remand for a new trial on these claims.

## Intentional Infliction of Emotional Distress

[10]  The plaintiff next claims that each of the individual defendants (Mr. Baucom, Mr. Bellamy, Mr. Ghoulis, Mr. Gordon, Mr. Medford and Mr. Mumma) intentionally inflicted emotional distress upon her. She also argues that the individual defendants Mr. Medford and Mr. Gordon intentionally inflicted emotional distress upon her "on behalf of the fraternity."

> The tort of intentional infliction of mental or emotional distress was formally recognized in North Carolina by the decisions of our Supreme Court in *Stanback v. Stanback*, 297 N.C. 181, 254 S.E.2d 611 (1979). The claim exists "when a defendant's 'conduct exceeds all bounds usually tolerated by decent society' and the conduct 'causes mental distress of a very serious kind.'" *Id.* at 196, 254 S.E.2d at 622, *quoting* Prosser, The Law of Torts § 12, p. 56 (4th Ed. 1971). The elements of the tort consist of: (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress. *Dickens v. Puryear, supra.*

> The tort may also exist where defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress. Recovery may be had for the emotional distress so caused and for any other bodily harm which proximately results from the distress itself. *Id.* at 452-53, 276 S.E.2d at 355.

*Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 487-88, 340 S.E.2d 116, 119-20, *disc. review denied*, 317 N.C. 334, 346 S.E.2d 140 (1986). The issue, here, is whether the plaintiff presented sufficient evidence of each element of the tort of intentional infliction of emotional distress to withstand the defendants' directed verdict motions.

The standard for determining whether conduct is extreme or outrageous is well settled in this jurisdiction.

It is a question of law for the court to determine, from the materials before it, whether the conduct complained of may reasonably be found to be sufficiently outrageous as to permit recovery . . . . However, once conduct is shown which may be reasonably regarded as extreme and outrageous, it is for the jury to determine, upon proper instructions, whether the conduct complained of is, in fact, sufficiently extreme and outrageous to result in liability.

*Brown v. Burlington Industries, Inc.*, 93 N.C. App. 431, 436, 378 S.E.2d 232, 235 (1989), *review dismissed*, 326 N.C. 356, 388 S.E.2d 769 (1990) (quoting *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. at 491, 340 S.E.2d at 121).

We first address the claims against the defendants Mr. Ghoulis and Mr. Baucom. The evidence when taken as true and considered in the light most favorable to the plaintiff tends to show the following: that Mr. Ghoulis knew that the plaintiff had been drinking alcoholic beverages and that she "couldn't make a judgment call as to what she wanted to do"; that both Mr. Ghoulis and Mr. Baucom engaged in kissing and heavy petting with the plaintiff in the presence of others; and that the plaintiff was unconscious during physical contact. We do not condone the conduct alleged here. However, the record before us does not show conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hogan*, 79 N.C. App. at 493, 340 S.E.2d at 123 (quoting Restatement of Torts, § 46 comment (d) (1965)). Rather, the record only presents some evidence of a sexual battery, and we are unwilling to hold on this record that a sexual battery, standing alone, constitutes the required extreme and outrageous conduct. This assignment is overruled.

Similarly, the plaintiff claims that Mr. Bellamy, Mr. Gordon, Mr. Medford and Mr. Mumma exhibited extreme and outrageous conduct. However, the plaintiff has failed to present sufficient evidence in the record to show that each exhibited the required extreme and outrageous conduct. This assignment of error is likewise overruled.

### Negligence

[11] Finally, the plaintiff argues that the trial court erred in directing a verdict against her on the negligence claims she raised

against the Zeta Chapter of Lambda Chi Alpha, Lambda Chi Alpha Fraternity, Inc. and LCA Alumni Properties. We disagree.

Assuming *arguendo*, but without deciding, that the plaintiff stated valid negligence claims against each of the defendants, we hold that the plaintiff was contributorily negligent as a matter of law.

Contributory negligence is such an act or omission on the part of the plaintiff amounting to a want of ordinary care concurring and cooperating with some negligent act or omission on the part of the defendant as makes the act or omission of the plaintiff a proximate cause or occasion of the injury complained of.

*Adams v. Board of Education*, 248 N.C. 506, 511, 103 S.E.2d 854, 857 (1958). Here, the plaintiff admitted that she voluntarily consumed half a bottle of champagne, at least five or six beers and a shot of Southern Comfort liquor. In her own words, she became "extremely intoxicated" and at some point passed into a state of unconsciousness. "Plaintiff's act of consuming sufficient quantities of intoxicants to [cause her to become unconscious] amounts to 'a want of ordinary care' which proximately caused [any injury she suffered and constitutes] contributory negligence as a matter of law." *Brower v. Robert Chappell & Assocs., Inc.*, 74 N.C. App. 317, 320, 328 S.E.2d 45, 47, *disc. review denied*, 314 N.C. 537, 335 S.E.2d 313 (1985).

However, during oral argument the plaintiff argued that even if she was contributorily negligent as a matter of law, the defendants' actions amounted to willful and wanton negligence and therefore survive the plaintiff's contributory negligence. It is well established that a party's contributory negligence will not preclude recovery for injuries proximately caused by other's willful and wanton negligence. *Fry v. Southern Public Utilities Co.*, 183 N.C. 282, 314, 111 S.E. 354, 361 (1922). " 'Wilful and wanton' negligence is conduct which shows either a deliberate intention to harm, or an utter indifference to, or conscious disregard for, the rights or safety of others." *Siders v. Gibbs*, 31 N.C. App. 481, 485, 229 S.E.2d 811, 814 (1976).

Here, the plaintiff has failed to present sufficient evidence to support a claim of willful or wanton negligence. Rather, at best, the plaintiff has only shown that the defendants may have been inattentive or inadvertent to the fact that alcohol was being served

to minors at the Lambda Chi Alpha fraternity house. Evidence of mere inadvertence will not preclude the defense of contributory negligence. *See, e.g., Blevins v. France,* 244 N.C. 334, 341-43, 93 S.E.2d 549, 554-56 (1956) (evidence that stock car race officials started a race inadvertent to the fact that intestate's car was stalled on the track was insufficient to establish willful or wanton negligence so as to preclude the defense of contributory negligence). This assignment is overruled.

### Remaining Claims

The plaintiff has abandoned any remaining claims for which the trial court directed a verdict in favor of the defendants by failure to offer reason, argument or authority in her brief. N.C.R. App. P. 28(b)(5).

### VIII

In conclusion, we hold that the trial court correctly entered directed verdict on each cause of action except the civil battery actions against Mr. Ghoulis and Mr. Baucom. Accordingly, we reverse the trial court's entry of directed verdict against the plaintiff on those two claims and remand for a new trial.

Affirmed in part; reversed and remanded in part.

Judges JOHNSON and ORR concur.