BRYANT, Judge.
 

 *121
 
 Where defendant has not met his burden to show that defense counsel was deficient by not fulfilling a promise made to the jury in his opening statement, defendant was not prejudiced and is not entitled to a new trial.
 

 Arthur Lee Givens, defendant, and Donald Everette Gist, the victim, became acquainted in the fall of 2014 while they both stayed at Schameka Earl's home for a few weeks. At
 
 *44
 
 first, Gist got along well with both Earl and defendant. After a few weeks, however, both Earl and defendant began having issues with Gist. Defendant, who testified at trial, said Gist began threatening him, and other people in the house had to intervene to keep peace between them, as he and Gist "had each other's throat."
 
 *122
 
 On one occasion, defendant saw Gist carrying a handgun tucked into his pants as he walked around Earl's house. A few days after Thanksgiving, on or about 4 December 2013, after suspecting that Gist had a gun in her house, Earl testified that she told Gist to move out.
 

 On 6 December 2013, the day of Gist's murder, Earl, defendant, and Tonya McCaster were at Earl's house. McCaster testified that defendant received a telephone call and, after he hung up, defendant said he "was gonna murder him." Defendant left and returned less than ten minutes later. Upon his return to Earl's house, he said, "I did it." McCaster testified that she heard sirens and the sound of an ambulance and police cars. Defendant then left Earl's house quickly.
 

 Also on 6 December 2013, Jason Dobie, who was staying in a home near Earl's house, left to walk to the Queens Mini Mart. As he was walking there, he heard several gunshots. After he heard the gunshots, defendant ran past him in the direction of Earl's house. As defendant passed Dobie, Dobie heard defendant say "he shouldn't have crossed me." Dobie arrived at the Queens Mini Mart to see Gist lying dead on the pavement.
 

 The Queens Mini Mart operated a surveillance camera at the time of the shooting. This camera's footage depicted the scene before and during the shooting. The video footage showed,
 
 inter alia,
 
 the following: (1) defendant at the Mini Mart; (2) that Gist had no weapon in his hand; (3) that Gist did not walk towards or otherwise approach defendant; (4) before Gist was shot, he started walking away from defendant; (5) defendant pulled out a gun as Gist continued to walk away from defendant; (6) defendant shot Gist a total of five times, killing him; and (7) even after defendant shot Gist and Gist was on the ground, defendant continued to shoot him. Defendant testified that he believed Gist had a gun, based on a bulge he saw on Gist's person. Defendant also testified that he "felt eminent [sic] danger at the time." Four days later, defendant was arrested.
 

 Forensic evidence revealed that Gist had gunshot wounds to the head, torso, back, and hands, and that the cause of death was from gunshot wounds to the head and chest, each one of which was independently lethal. The police found no weapons on Gist after his death, but the medical examiner found a crack pipe in Gist's clothing.
 

 Defendant was indicted on charges of first-degree murder and possession of a firearm by a felon on 16 December 2013. Defendant was tried on 17-21 November 2014 in the Criminal Superior Court of Mecklenburg County, before the Honorable Eric L. Levinson.
 

 *123
 
 Before trial, defendant's attorney filed notice of intent to assert self-defense and also requested a
 
 Harbison
 
 hearing. During the
 
 Harbison
 
 hearing, defendant acknowledged that he had reviewed the discovery in his case; he had a basic understanding of the concept of self-defense; it was his decision as to whether or not his attorney could ask the jury to convict him of voluntary manslaughter; and he understood he could assert self-defense without making any concessions. Defendant specifically acknowledged that he agreed with his attorney's plan to concede to the jury that defendant had possessed a gun and that he had killed Gist by shooting him. The trial court concluded that defendant made these decisions knowingly, voluntarily, and intelligently. Thereafter, defendant pled guilty to the charge of possession of a firearm by a felon, with no plea agreement or other representation from the State. The trial court continued judgment upon sentencing.
 

 At trial, during defense counsel's opening statement, he told the jurors that the evidence would show that defendant's conduct had been justified:
 

 [Defendant] did kill Mr. Gist. There is no question about that.... The question is was the conduct justified. When you hear all of the evidence you're going to find that his conduct was justified based on everything that had happened in the weeks before
 
 *45
 
 and what finally led up to this event.... I believe the evidence that you will hear and in the end everything will say he was justified.
 

 At the charge conference following the presentation of all the evidence, defense counsel requested an instruction on voluntary manslaughter, saying that imperfect self-defense supported the instruction. The trial court denied that request. Defense counsel also requested an instruction on second-degree murder, which the trial court granted. After the trial court explained that it would instruct the jury only on first-degree and second-degree murder, defense counsel made a motion for a mistrial based on his own ineffective assistance of counsel. The motion for a mistrial was denied.
 

 Defendant was found guilty of first-degree murder. The trial court consolidated the conviction for possession of a firearm with the first-degree murder conviction and sentenced defendant to life in prison without parole. Defendant appeals.
 

 _________________________
 

 *124
 
 On appeal, defendant argues that trial counsel's failure to produce promised evidence amounts to ineffective assistance of counsel. Specifically, defendant contends that because defense counsel specifically promised that the evidence would show the jury that defendant's conduct was justified, but none of the evidence presented suggested that defendant's shooting the victim was justified or done in self-defense, defense counsel's failure to deliver on his promise to the jury amounted to ineffective assistance of counsel. We disagree.
 

 "[I]neffective assistance of counsel claims 'brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing.' "
 
 State v. Thompson,
 

 359 N.C. 77
 
 , 122-23,
 
 604 S.E.2d 850
 
 , 881 (2004) (citation omitted) (quoting
 
 State v. Fair,
 

 354 N.C. 131
 
 , 165,
 
 557 S.E.2d 500
 
 , 524 (2001) ).
 

 To prevail on a claim of ineffective assistance of counsel, a defendant must first show that his counsel's performance was deficient and then that counsel's performance prejudiced his defense. Deficient performance may be established by showing that counsel's representation fell below an objective standard of reasonableness. Generally, to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
 

 State v. Allen,
 

 360 N.C. 297
 
 , 316,
 
 626 S.E.2d 271
 
 , 286 (2006) (internal citations and quotation marks omitted). Further, when a court undertakes to engage in this analysis,
 

 every effort [must] be made to eliminate the distorting effects of hindsight.... Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."
 

 Strickland v. Washington,
 

 466 U.S. 668
 
 , 689,
 
 104 S.Ct. 2052
 
 , 2065,
 
 80 L.Ed.2d 674
 
 , 694-95 (1984) (citation omitted).
 

 *125
 
 Defendant argues that if defense counsel had not relied on a strategy of self-defense, defendant would not, at his attorney's suggestion, have conceded essential elements of the crime. Defendant further contends that defense counsel should have been aware that the evidence was legally insufficient to support any type of defensive force instruction and that defense counsel's deficient performance was exacerbated by the promise made to the jury that there would be evidence of justification for the shooting.
 

 In support of his argument, defendant relies on two cases,
 
 State v. Moorman,
 

 320 N.C. 387
 
 ,
 
 358 S.E.2d 502
 
 (1987), and
 
 Anderson v. Butler,
 

 858 F.2d 16
 
 (1st Cir.1988), contending that each stands for the proposition that a promise made by defense counsel in an opening statement which counsel does not ultimately fulfill amounts to a
 
 *46
 

 per se
 
 instance of ineffective assistance of counsel, requiring a new trial. However, these cases are either highly distinguishable (
 
 Moorman
 
 ), or not controlling authority (
 
 Anderson
 
 ).
 

 In
 
 Moorman,
 
 the N.C. Supreme Court noted that defense counsel's "promised defense severely undercut the credibility of the actual evidence offered at trial...."
 
 320 N.C. at 401
 
 ,
 
 358 S.E.2d at 511
 
 . Including his failing to deliver on a promised defense, the defendant's trial counsel in
 
 Moorman
 
 committed,
 
 inter alia,
 
 a wide array of incredibly egregious acts of misconduct: (1) he told the jury in his opening statement that he would produce "one critical piece of evidence" which would show it was physically impossible for the defendant to have raped the victim, even though he had not adequately investigated the facts of the case; (2) he did not locate or interview any witnesses before the trial started; (3) he never prepared his own client for trial, and he never discussed his testimony or the questions he could expect to be asked on direct or cross-examination; (4) he took a wide combination of powerful drugs during the trial, which caused his speech to be slurred and caused him to fall asleep at trial (including during cross-examination of the defendant); and (5) he labored under a conflict of interest in that he had a "public cause" of establishing a racially motivated prosecution.
 
 Id.
 
 at 393-97,
 
 358 S.E.2d at 506-08
 
 .
 

 Unlike the defendant's appeal in
 
 Moorman,
 
 in the instant case defendant's entire appeal, based on ineffective of assistance of counsel, rests upon the assumption that defense counsel misled defendant into conceding, admitting, and stipulating to factual matters that were hotly disputed and subject to meaningful controversy. This was not the case. Here, defendant conceded and stipulated only to facts as to which there
 
 *126
 
 could be no dispute, given what the Queens Mini Mart video surveillance footage undeniably showed.
 

 First, the trial court conducted a comprehensive
 
 Harbison
 
 inquiry. A "
 
 Harbison
 
 inquiry" regards the principle enunciated in
 
 State v. Harbison,
 

 315 N.C. 175
 
 ,
 
 337 S.E.2d 504
 
 (1985), in which the N.C. Supreme Court held that "a counsel's admission of his client's guilt, without the client's knowing consent and despite the client's plea of not guilty, constitutes ineffective assistance of counsel."
 
 Id.
 
 at 179,
 
 337 S.E.2d at 506-07
 
 . Accordingly, "[b]ecause of the gravity of the consequences" of pleading guilty, an "inquiry" with defendant is conducted, which involves a thorough questioning of the defendant by the trial court in order to ensure that his "decision to plead guilty ... [is] made knowingly and voluntarily ... after full appraisal of the consequences."
 
 Id.
 
 at 180,
 
 337 S.E.2d at 507
 
 (citations omitted) ("[T]he gravity of the consequences demands that the decision to plead guilty remain in the defendant's hands. When counsel admits his client's guilt without first obtaining the client's consent, the client's rights to a fair trial and to put the State to the burden of proof are completely swept away.");
 
 see
 

 State v. Holder,
 

 218 N.C.App. 422
 
 , 425-28,
 
 721 S.E.2d 365
 
 , 367-69 (2012) (holding that defense counsel's concession during his closing argument of defendant's guilt of a lesser-included offense was not
 
 per se
 
 ineffective assistance of counsel where defendant consented to his attorney's concession);
 
 State v. Maready,
 

 205 N.C.App. 1
 
 , 12-13,
 
 695 S.E.2d 771
 
 , 779-80 (2010) (reviewing a trial court's
 
 Harbison
 
 hearing to determine whether defendant explicitly consented to defense counsel's concessions made during closing argument);
 
 State v. Johnson,
 

 161 N.C.App. 68
 
 , 77-78,
 
 587 S.E.2d 445
 
 , 451 (2003) (concluding "that the trial court's [
 
 Harbison
 
 ] inquiry was adequate to establish that defendant had previously consented to his counsel's concession[s]").
 

 Here, the trial court's
 
 Harbison
 
 inquiry with defendant revealed that defendant "knowingly and voluntarily" consented to allow defense counsel to make certain concessions to the jury-specifically, that he had possessed a gun and killed the victim by shooting him-and gave permission for his attorney to argue for a voluntary manslaughter conviction:
 

 THE COURT: ... [Y]ou understand that it is your independent decision on whether or not to make certain concessions or to, you know, allow [defense counsel] to argue certain things?
 

 *47
 
 Do you understand that?
 

 THE DEFENDANT: Yes, sir.
 

 *127
 
 THE COURT: And has [defense counsel], you know, in the last weeks or months shared with you the [d]iscovery? For example, the materials that the government has provided in terms of what their case or information looks like?
 

 [DEFENDANT]: Yes, sir.
 

 THE COURT: And do you have some basic understanding about what self-defense means?
 

 [DEFENDANT]: Yes, sir.
 

 THE COURT: And do you understand that no matter what [defense counsel] has said to you or other lawyers or others have said to you that again, it is your independent decision on whether or not to allow your counsel to basically tell the jury that they should convict you of voluntary manslaughter?
 

 Do you understand that?
 

 [DEFENDANT]: Yes, sir.
 

 THE COURT: And that you could still assert, assuming that the Court at some point allows the argument to be made to the jury, but do you understand that it is not required as a matter of law that you concede anything in order to allow you to argue self-defense?
 

 Stated differently, you know, the Court might still allow you to ask the jury to find self-defense here even if you didn't make any concessions or allow [defense counsel] to argue any of these things; do you understand that?
 

 [DEFENDANT]: Yes, sir.
 

 THE COURT: But did you have any questions for me about this subject?
 

 [DEFENDANT]: No, sir. My attorney went over everything.
 

 THE COURT: And are you in agreement that your lawyers should be permitted to make concessions to the jury, being that you possessed a firearm, that you shot numerous times resulting in-shot the decedent resulting in his death?
 

 And furthermore your agreement to give them flexibility to argue that they should convict you of voluntary
 
 *128
 
 manslaughter as we go through this trial, is that your desire, your wish?
 

 [DEFENDANT]: Yes, sir.
 

 Unlike the defense counsel in
 
 Moorman,
 
 here, it was further revealed during the
 
 Harbison
 
 inquiry that defense counsel (1) met with defendant more than fifteen times during the week prior to trial; (2) went over all of defendant's anticipated testimony and all of the State's discovery and evidence, including the Queens Mini Mart video footage; and (3) went over all the elements of the charges of murder and manslaughter under North Carolina law and the legal doctrines of excessive force and perfect versus imperfect self-defense. We also note that counsel in the instant case made several motions before and during trial on behalf of defendant, made several objections to questions posed to witnesses by the State, and vigorously and extensively cross-examined the State's witnesses. Further, there is no evidence defense counsel had any conflict of interest, was under the influence of drugs, or fell asleep during trial.
 

 Ultimately,
 
 Moorman
 
 is distinguishable because, here, defense counsel's performance was not deficient, as his efforts on behalf of defendant illustrate, and defendant cannot show prejudice, as the State presented overwhelming evidence at trial to prove beyond a reasonable doubt that defendant did commit first-degree murder. Such evidence was completely independent of any concession, admission, or stipulation by defendant or his attorney.
 

 In
 
 Anderson,
 
 a First Circuit case on which defendant relies, defense counsel made a "dramatic" promise to the jury in his opening statement related to extremely material and exculpatory testimony.
 
 858 F.2d at 17
 
 . The evidence was available to defense counsel, and he could have presented it to the jury, as promised, but he chose not to do so. He had told the jury he would call a psychiatrist and a psychologist but, without calling any doctors, rested his case based on lay witness testimony only.
 

 Id.
 

 The First Circuit held that "to promise ... such powerful evidence, and then not produce it, could not be disregarded as harmless. We find it prejudicial as a matter of law."
 

 Id.
 

 at 19
 
 .
 

 *48
 
 Not only is
 
 Anderson
 
 not controlling authority, but also, to the extent
 
 Anderson
 
 stands for the proposition that defense counsel's failure to fulfill a promise made in an opening statement constitutes an act of
 
 per se
 
 ineffective assistance of counsel mandating a new trial, the United States Court of Appeals for the Fourth Circuit eschewed
 
 Anderson
 
 and the concept of such a bright-line rule:
 

 *129
 
 [In]
 
 United States v. McGill,
 

 11 F.3d 223
 
 (1st Cir.1993), the First Circuit appeared to read narrowly its
 
 Anderson
 
 decision. The court said: "Although a failure to produce a promised witness
 
 may under some circumstances
 
 be deemed ineffective assistance, ... the determination of inefficacy is
 
 necessarily fact based
 
 ...."
 

 We agree with the reasoning of the more recent First Circuit decision and with Judge Breyer's dissenting opinion in
 
 Anderson,
 
 both of which adhere to
 
 Strickland's
 
 express warning that:
 

 No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.
 

 ... In our view, assuming counsel does not know at the time of the opening statement that he will not produce the promised evidence, an informed change of strategy in the midst of trial is "virtually unchallengeable[.]" Were we to adopt [the defendant's] position, we would effectively be instructing defense counsel to continue to pursue a trial strategy even after they conclude that the original strategy was mistaken or that the client may be better served by a different strategy.
 

 Turner v. Williams,
 

 35 F.3d 872
 
 , 903-04 (4th Cir.1994) (internal citations omitted) (quoting
 
 Strickland,
 

 466 U.S. at 688-89
 
 ,
 
 104 S.Ct. at 2065
 
 ,
 
 80 L.Ed.2d at
 
 694 ),
 
 rev'd on other grounds in
 

 O'Dell v. Netherland,
 

 95 F.3d 1214
 
 , 1222 (4th Cir.1996).
 

 This Court and the North Carolina Supreme Court have both likewise rejected a bright-line rule in favor of a fact-specific approach that evaluates the prejudice to the defendant.
 
 See, e.g.,
 

 State v. Mason,
 

 337 N.C. 165
 
 , 176-77, 177 n. 1,
 
 446 S.E.2d 58
 
 (1994) (quoting
 
 Moorman,
 

 320 N.C. at 401-02
 
 ,
 
 358 S.E.2d at
 
 511 ) (finding opening remarks made by defense counsel did not constitute a "promised defense" in the context determined to be at issue in
 
 Moorman,
 
 and noting that in
 
 Moorman,
 
 the N.C. Supreme Court
 
 *130
 
 based its holding on several facts, including defense counsel's "wide-ranging opening assertions," but also his use of drugs and "his drowsiness, lethargy, and inattentiveness during portions of the trial");
 
 State v. Ortez,
 

 178 N.C.App. 236
 
 , 249-50,
 
 631 S.E.2d 188
 
 , 198 (2006) (distinguishing
 
 Moorman
 
 and finding that defense counsel kept its "promise" to the jury where evidence introduced at trial corroborated defendant's opening statement);
 
 see also
 

 State v. Floyd,
 
 No. COA12-1123,
 
 2013 WL 2163808
 
 , *8 (N.C.Ct.App. May 21, 2013) (unpublished) (distinguishing
 
 Moorman
 
 where defense counsel's failure to recall a witness, standing alone, did not rise to the level of ineffective assistance of counsel).
 

 However, one particularly unique incident occurred in this case, which requires consideration. At the charge conference, defense counsel argued that imperfect self-defense supported an instruction on voluntary manslaughter. He also asked for an instruction on second-degree murder. The trial court denied an instruction on self-defense, but stated it would instruct the jury on first-degree and second-degree murder. Defendant's trial attorney then made a motion for a mistrial based on his own ineffective assistance of counsel:
 

 At this time I think for the record I'll make a motion for a mistrial based on the ineffective assistance of counsel. We made a concession at the beginning in opening arguments, jury selection, our questioning all based in anticipation of getting the voluntary manslaughter [jury instruction]. My client relied upon my representations there and conceivably to his detriment at
 
 *49
 
 this point. And would ask the Court to consider a mistrial at this time.
 

 The trial court denied the motion, stating that "certainly there was a reasonable effort and argument [by defense counsel] to try to make out a showing for self-defense."
 

 The U.S. Supreme Court has laid out a test, which North Carolina has adopted,
 
 see
 

 State v. Braswell,
 

 312 N.C. 553
 
 ,
 
 324 S.E.2d 241
 
 (1985), which places a very high burden on defendants to establish ineffective assistance of counsel: "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct
 
 so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.
 
 "
 
 Strickland,
 

 466 U.S. at 686
 
 ,
 
 104 S.Ct. at 2064
 
 ,
 
 80 L.Ed.2d at 692-93
 
 (emphasis added).
 

 Despite defense counsel's own argument to the court that his representation of defendant constituted ineffective assistance of counsel,
 
 *131
 
 the record does not support the argument that defense counsel's performance "so undermined the adversarial process that the trial cannot be relied on as having produced a just result."
 

 Id.
 

 To the contrary, the record is replete with motions defense counsel made on behalf of defendant, objections made at trial, and thorough cross-examination of the State's witnesses. Further, defendant testified to his contentious relationship with the victim, and that he felt threatened by the victim who possessed, at varying times, a knife and a gun. Defendant testified that he saw what he thought was a gun on the victim, that he feared for his life, and that is why he shot the victim and kept shooting.
 

 This testimony could be considered as evidence of justification, such that defendant's challenge that counsel failed to fulfill a promise made in his opening statement is without merit. Defense counsel promised and delivered evidence, but it was for the jury to determine whether to believe that evidence. Defense counsel, through the adversarial process, not only put forth a defense for defendant, but also forced the State to prove its case beyond a reasonable doubt and challenged the State at every reasonable opportunity. In moving for mistrial based on his own alleged ineffective assistance of counsel, defense counsel contrived to demonstrate his zealous advocacy on behalf of his client by choosing to effectively fall on his own sword.
 

 Defendant has not shown that defense counsel was deficient and that his trial was prejudiced as a result. Accordingly, defendant's argument that he received ineffective assistance of counsel and is entitled to a new trial is overruled.
 

 NO ERROR.
 

 Judges DILLON and ZACHARY concur.